**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

UPPER PENINSULA ENVIRONMENTAL COALITION, ENVIRONMENTAL LAW & POLICY CENTER, and NATURAL RESOURCES DEFENSE COUNCIL,

Plaintiffs,

v.

TOM SCHULTZ, Chief of the U.S. Forest Service; LENORE LAMB, Forest Supervisor of the Ottawa National Forest; TREVOR HAHKA, District Ranger; and the UNITED STATES FOREST SERVICE,

Defendants.

Case No. ___________

**Complaint for Declaratory and Injunctive Relief**

## INTRODUCTION

1. This case challenges the U.S. Forest Service's arbitrary and unlawful decision to subject nearly 80,000 acres of the Ottawa National Forest to intensive logging in defiance of the National Environmental Policy Act, the National Forest Management Act, and the Ottawa's own management plan.

2. On July 17, 2026, the Forest Service announced its final approval of the Silver Branch Vegetation Management Project—a thirty-year plan to transform nearly ten percent of the Ottawa's lands through commercial logging, gravel

mining, and other activities. As the Ottawa's own analysis made clear, the authorized actions cannot be undertaken without significant and foreseeable environmental effects. The Forest Service, however, has insisted on declaring otherwise. According to the agency's conclusory environmental assessment, large swathes of the Ottawa can somehow be subjected to clearcutting and other destructive activities without significant effects, eliminating the need to evaluate the Silver Branch project—and more environmentally protective alternatives—in a thorough environmental impact statement.

3. The Forest Service's assessment violated the fundamental requirements of the National Environmental Policy Act. In failing to fully evaluate the impacts of logging nearly 80,000 acres of Michigan's Upper Peninsula, the assessment denied both decisionmakers and the public the information required to understand the project and its ecological implications. And in failing to evaluate a reasonable range of alternatives, the Forest Service neglected to consider viable means of protecting some of the Ottawa's most cherished lands from the adverse impacts of logging.

4. The Forest Service's failures were not limited to the National Environmental Policy Act. In authorizing logging on lands the Ottawa has rightly designated as unsuitable for timber harvest, the Forest Service arbitrarily and unlawfully defied the terms of the Ottawa's own management plan. And in approving extensive clearcuts that will exacerbate the forest's significant problems

with deer browsing and tree regeneration, the agency violated both the Ottawa's plan and the National Forest Management Act.

5. To ensure the Ottawa's irreplaceable resources are adequately protected, this Court should vacate the Forest Service's arbitrary and unlawful environmental assessment, finding of no significant impact, and decision approving the Silver Branch project.

**JURISDICTION AND VENUE**

6. Plaintiffs bring this action pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq*., the National Forest Management Act, 16 U.S.C. §§ 1600, *et seq*., and the Administrative Procedure Act, 5 U.S.C. § 702, which waives the defendants' sovereign immunity.

7. This Court has federal-question jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C. § 1331, and it may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8. Venue is proper in the Western District of Michigan under 28 U.S.C. § 1391(e)(1) because one of the plaintiffs, the Upper Peninsula Environmental Coalition, resides within the District, and the alleged legal violations occurred within the District. Venue is proper in the Western District's Northern Division because the Ottawa National Forest is located within the Division, the Upper Peninsula Environmental Coalition resides within the Division, and the claims in this case arose within the Division. Local Civ. R. 3.2; 28 U.S.C. § 102(b)(2).

## PARTIES

### *Plaintiffs*

9. The Upper Peninsula Environmental Coalition, or "UPEC," is the oldest environmental organization in Michigan's Upper Peninsula. Founded in 1976, the Coalition strives to preserve and enhance the unique cultural and natural resources of the Upper Peninsula through public education, the promotion of science-based decisions and policies, and reasoned dialogue with communities, governments, industries, and others. UPEC is based in Houghton, Michigan, and is bringing this action on behalf of its adversely affected members.

10. The Environmental Law & Policy Center, or "ELPC," is a public-interest environmental-advocacy organization dedicated to protecting the lands, wildlife, and communities of the Midwest. Headquartered in Chicago, ELPC has long supported both members and staff in Michigan. It is bringing this action on behalf of its adversely affected members.

11. Plaintiff Natural Resources Defense Council, or "NRDC," is a national nonprofit environmental organization whose purpose is to safeguard the Earth, its people, its plants and animals, and the natural systems on which all life depends. Founded in 1970, NRDC is organized under the laws of the State of New York and is headquartered in New York, New York. NRDC has more than 474,000 members nationwide, including approximately 10,789 members in Michigan and 8,396 members in Wisconsin. NRDC members regularly visit, recreate in, study, observe wildlife in, and otherwise use and enjoy the Ottawa National Forest, including

lands that will be affected by the Silver Branch project. NRDC brings this action on behalf of its adversely affected members.

12. The interests the plaintiff organizations seek to protect in this action are germane to the organizations' missions and purposes. Each of the groups also has members who use and enjoy the Ottawa National Forest, including lands within the Silver Branch project area, for recreational, educational, conservation, and wildlife-observation purposes. The interests of these members would be harmed if the Silver Branch project is allowed to move forward, and neither the claims asserted nor the relief requested in this case require the members' participation as parties.

13. UPEC member Sara Basso lives within the boundaries of the Ottawa National Forest on Hannah Webb Lake and enjoys experiencing the quiet of the woods, picking berries, foraging mushrooms, fishing, and photographing wildlife. She spends time every day in areas that would be directly impacted by the Silver Branch project and plans to continue doing so. She particularly enjoys swimming in and paddling on Hannah Webb Lake, Winslow Lake, Norway Lake, Perch Lake, Wolf Creek, Lake Ste. Kathryn, Marten Lake, the Paint River, and other waters. Sara is already being affected by the large number of trucks that carry gravel and other road-building materials in her area, as they can be heard as early as 3:30 a.m., impacting her sleep and nearby wildlife. She is concerned about the additional impact the Silver Branch project would have on her home, her recreational use of the areas she frequents, tourism, and the local economy.

14. UPEC member and former board member Margaret (Maggie) Scheffer has lived within or near the boundaries of the Ottawa National Forest since approximately 1979. In 1980, she first visited the lands that would become the Sturgeon River Gorge Wilderness Area and immediately loved them. Maggie spends time in the Silver Branch project area at least annually, including hiking the North Country Trail, paddling the Paint River, and making day trips to multiple lakes. She plans to continue recreating in these areas at least annually into the foreseeable future and is concerned about the impacts the Silver Branch project could have on her continued use and enjoyment of them.

15. ELPC member Klara Kett is an undergraduate student at Michigan Technological University (MTU), studying Natural Resources Management. She is preparing for a career in shaping responsible environmental policies, including sustainable management of forests. Every year since 2019, Klara has gone camping with her forester father and the rest of her family in the Ottawa National Forest. She has visited the Sturgeon River Gorge Wilderness Area, Sturgeon River Falls, Silver Mountain, Bob Lake, Echo Lake, and the North Country Trail. Now that Klara is enrolled at MTU, she spends significant time within the Ottawa National Forest with friends, including within the Silver Branch project area, and plans to continue doing so. Klara enjoys planning hiking trips at least every other week, camping, sightseeing on forest trails and backroads, swimming, fishing, kayaking, boating, foraging, and climbing trees. Having already seen impacts from similar, smaller projects in the Ottawa, Klara worries about the drastic changes that the

Silver Branch project would bring to the remote and wild environments she loves to recreate in with her friends and family, and the harm these changes would cause to her use and enjoyment of those areas.

16. ELPC member Joan Schumaker Chadde has lived in the U.P. for approximately 31 years. Her career included environmental advocacy, outdoor leadership instruction, riparian management, and environmental and STEM education. Joan taught annual environmental education programs at Camp Nesbit, within the Silver Branch project area, which still hosts roughly 500 sixth graders each year. She regularly hikes, bikes, camps, and kayaks at places within and around the Silver Branch project area, including Lake Ste. Kathryn, Bob Lake, the Sturgeon River Gorge Wilderness Area, the North Country Trail, and the Paint River. She plans to keep doing so every summer. Joan fears the project will harm riparian areas and recreation lands, adversely impacting her own use and enjoyment of the project area, and depriving young people of the chance to experience wild lands in their natural state.

17. ELPC member Mary Hanson was born and raised in Hancock, Michigan, in the western Upper Peninsula, where her Finnish-American family has deep roots. After 30 years of military service and 26 years of federal service, access to wilderness is essential to her mental and emotional health. In 2018, she bought property in Baraga County, Michigan, and she visits the Ottawa National Forest approximately twice per month, year-round. She enjoys hiking the North Country Trail, camping at Norway Lake, and kayaking on the Sturgeon River. She

frequently recreates within the Silver Branch project area and has taken more than a dozen hikes within the area during the past five years alone. She plans to continue recreating within the project area in the future. Mary supports responsible logging as forest management but is concerned that the Silver Branch project will negatively impact her use of the project area, and that it was approved without an environmental impact statement or full consideration of alternatives.

18. NRDC member Gwen Ebert is a lifelong Wisconsin resident, retired educator, and avid outdoorsperson who has spent many years hiking, backpacking, canoeing, and exploring natural areas throughout the United States. She has visited and recreated in the Ottawa National Forest on numerous occasions, including canoeing on the Ontonagon River and other rivers and streams within the Ottawa watershed. Through these experiences, Gwen has developed a deep appreciation for the Ottawa's waterways, wildlife, forests, and natural character. She values the Ottawa because it provides opportunities for quiet recreation, immersion in nature, wildlife observation, and enjoyment of relatively intact northern forest ecosystems. Gwen intends to continue visiting and recreating in the Ottawa National Forest, including during this autumn and spring, when she plans to visit Sturgeon Falls, Mex-i-min-e Falls, hiking areas, and other natural attractions within and near the area affected by the Silver Branch project. Gwen also has longstanding ties to the broader region surrounding the Ottawa through her family's property near Jute Lake in Wisconsin's Northern Highlands-American Legion State Forest, which she has regularly visited and enjoyed for more than fifty

years. Because her family's property lies approximately one hour from the Ottawa, and because she understands the region's forests, watersheds, and wildlife-migration corridors to be interconnected, Gwen is concerned that the Silver Branch project's logging, road construction, and related activities will degrade the natural scenery, recreational opportunities, wildlife habitat, water quality, and forest character of areas she intends to visit and enjoy in the future. She is further concerned that these impacts will diminish both her future enjoyment of the Ottawa National Forest and her use and enjoyment of her family's property. Even if the Silver Branch project proceeds, Gwen intends to continue visiting and recreating in these areas, but her recreational, educational, wildlife-observation, and conservation interests, and her use of these areas, would be adversely affected by the project.

19. NRDC member Beverly Strassman is a Michigan resident, a professor at the University of Michigan, and a longtime supporter of NRDC. Throughout her professional career studying biology and anthropology, she has developed a strong interest in wildlife, ecology, conservation, and the natural world. Together with her husband, Beverly regularly travels throughout the Great Lakes region to hike, canoe, backpack, birdwatch, observe wildlife, and explore public lands. In August 2025, Beverly visited the Ottawa National Forest on two occasions. During those visits, she hiked, birdwatched, and explored portions of the forest within or near the area that will be affected by the Silver Branch project, observing birds, wildlife, waterfalls, and northern forest ecosystems. She was particularly impressed by the

area's wild character, sense of solitude, and opportunities for quiet recreation and wildlife observation. Beverly enjoyed her visits to the Ottawa so much that she and her husband began making plans to return for longer trips involving camping, canoeing, backpacking, and hiking. Because they regularly travel through the upper Great Lakes region, Beverly intends to return to the Ottawa in the future and expects to spend additional time recreating there in the coming years. Indeed, she is certain that she and her family will revisit the forest during the decades-long period currently contemplated for implementation of the Silver Branch project. Beverly is concerned that the project's logging, road construction, and related activities will diminish the wild and secluded character of the areas she visited and intends to visit again; will reduce opportunities to observe and study birds and wildlife; will interfere with recreational activities such as hiking and camping; and will degrade the scenic and natural qualities she values as part of her use and enjoyment of these areas. Even if the project proceeds, Beverly intends to continue visiting the Ottawa National Forest, but her recreational, educational, and wildlife-observation interests, and her use of the project area, would be adversely affected by the project's impacts on the forest conditions, wildlife habitat, sense of solitude, and natural character in the area.

20. In short, the recreational, educational, conservation, aesthetic, and wildlife-observation interests of the plaintiffs' members will be adversely and irreparably injured by the Silver Branch project unless the requested relief is granted. These are actual, concrete injuries, traceable to the defendants' conduct,

that would be redressed by the requested relief. The plaintiff organizations and their members have no adequate remedy at law.

### *Defendants*

21. Tom Schultz is the Chief of the U.S. Forest Service. In that capacity, he has supervisory responsibility over the agency's management of our national forests, including the Ottawa, and their compliance with federal law. Chief Schultz is sued in his official capacity.

22. Lenore Lamb is the Forest Supervisor of the Ottawa National Forest. In that capacity, she is responsible for the management of the Ottawa, including its compliance with federal law. Supervisor Lamb is sued in her official capacity.

23. Trevor Hahka is the District Ranger for the Ottawa's Bessemer, Iron River, and Watersmeet ranger districts. He also served as the Responsible Official for the Silver Branch Vegetation Management Project. He is sued in his official capacity.

24. The U.S. Forest Service is a federal agency within the United States Department of Agriculture. The agency is charged with responsibly managing America's National Forest System, including the Ottawa, and ensuring that actions within our national forests comply with federal law.

## STATUTORY FRAMEWORK

25. For nearly sixty years, the National Environmental Policy Act, or "NEPA," has granted a vital set of protections to communities and lands across the country. Under Section 101 of the statute, all federal agencies are charged with

carrying out a critical mandate: "us[ing] all practicable means, consistent with other essential considerations of national policy," to "fulfill the responsibilities of each generation as trustee of the environment[.]" 42 U.S.C. § 4331(b). And under Section 102, agencies must implement "a 'set of action-forcing procedures'" that ensure they will fulfill NEPA's mandate by "'tak[ing] a hard look at [the] environmental consequences'" of their actions. *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (internal quotations omitted) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)); 42 U.S.C. § 4332(2)(C).

26. At the center of NEPA's action-forcing scheme is the environmental impact statement, or "EIS." In the words of the statute, every federal agency must "include in every recommendation or report on … major Federal actions significantly affecting the quality of the human environment, a detailed statement" addressing five fundamental issues:

> (i) [the] reasonably foreseeable environmental effects of the proposed agency action;
>
> (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

> (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(2)(C).

27. These requirements were recently reaffirmed by Congress. With the Fiscal Responsibility Act of 2023, each federal agency was again directed to "issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). A more limited "environmental assessment," Congress emphasized, can accordingly be used only when "a proposed agency action … does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown[.]" *Id.* § 4336(b)(2).

28. While the purpose of the Forest Service's challenged environmental assessment was to determine whether the Silver Branch project would have "reasonably foreseeable significant effect[s]" on the Ottawa's environment, the document failed to define—or even reference—this statutory standard. 42 U.S.C. § 4336(b)(1)–(2). The agency ultimately asserted, however, that it had applied the Council on Environmental Quality's "criteria for assessing significance"—criteria that were set forth in rules that remained in place "at the time of the [Forest Service's] analysis." Forest Supervisor Lenore Lamb, Letter Responding to the Objections of ELPC, *et al.* (July 15, 2026), at 8.

29. According to the referenced regulations, "[e]ffects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable[,]" including "[d]irect effects, which are caused by the action and occur at the same time and place"; "[i]ndirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable"; and "[c]umulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency … or person undertakes such other actions." 40 C.F.R. § 1508.1(i) (eff. July 1, 2024).

30. "In considering whether an adverse effect of … [a] proposed action is significant," the regulations required the Forest Service to "examine both the context of the action and the intensity of the effect." 40 C.F.R. § 1501.3(d) (eff. July 1, 2024).

31. With respect to "context," the rules directed the Forest Service to "consider the characteristics of the [project's] geographic area, such as proximity to unique or sensitive resources or communities with environmental justice concerns." 40 C.F.R. § 1501.3(d)(1) (eff. July 1, 2024). And the agency was further required to "consider the potential global, national, regional, and local contexts as well as the duration, including short- … [and] long-term effects." *Id.*

32. With respect to "intensity," the regulations set out a long list of factors the Forest Service should have considered "as applicable to the proposed action and

in relationship to one another[,]" including "[t]he degree to which the action may adversely affect unique characteristics of the geographic area such as … wetlands, wild and scenic rivers, or ecologically critical areas"; "[w]hether the action may violate relevant Federal, State, Tribal, or local laws or other requirements or be inconsistent with Federal, State, Tribal, or local policies designed for the protection of the environment"; "[t]he degree to which the potential effects on the human environment are highly uncertain"; and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat[.]" 40 C.F.R. § 1501.3(d)(2) (eff. July 1, 2024). While the Forest Service has claimed that it applied these standards in preparing its environmental assessment, it failed to do so. Ottawa National Forest, Silver Branch Vegetation Management Project: Environmental Assessment and Finding of No Significant Impact (July 2026 Update) ("Revised EA"), at 53; Forest Supervisor Lenore Lamb, Letter Responding to the Objections of ELPC, *et al.* (July 15, 2026), at 8.

33. The Forest Service's review and authorization of the Silver Branch project was also subject to the requirements of the National Forest Management Act, or "NFMA." Under the statute, the agency is obligated to "develop, maintain, and … revise land and resource management plans for units of the National Forest System … us[ing] a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." 16 U.S.C. § 1604(a)–(b). Among other things, these plans must "provide for diversity of plant and animal communities based on the suitability and capability of the specific land

area in order to meet overall multiple-use objectives," while also ensuring that steps are "taken"—"where appropriate, [and] to the degree practicable"—to "preserve the diversity of tree species similar to that existing in the region controlled by the plan[.]" *Id.* § 1604(g)(3)(B).

34. Once a management plan has been adopted, NFMA requires the Forest Service to ensure that any authorized actions are "consistent with" the plan's provisions. 16 U.S.C. § 1604(i). This obligation is particularly pronounced when it comes to clearcuts. Under the statute, clearcutting can "only" be "used … on National Forest System lands" when, among other things, it is "determined to be the optimum method … to meet the objectives and requirements of the relevant land management plan"; when "the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area"; and when "such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource." *Id.* § 1604(g)(3)(F).

**BACKGROUND**

35. The Ottawa National Forest encompasses some of the most cherished lands in Michigan's Upper Peninsula. It is also in "recovery." Ottawa National Forest, Final Environmental Impact Statement to Accompany the Land and Resource Management Plan (Mar. 2006) ("Ottawa Plan FEIS"), at 3-6, 3-73. Though much of the forest was "once dominated by large mature trees"—"with perhaps

about 50% in old growth condition"—"[m]ajor changes took place in the late 1800s and early 1900s when the area was nearly completely logged over." *Id.* at 3-15. The Ottawa's mature stands were replaced by new trees, and the new trees changed the forest's composition. "Before European settlement," for example, "hemlock accounted for about 17% of the tree species on the Ottawa[,]" while aspen "only made up about 2%" of the forest. *Id.* at 3-44, 3-48–3-49. By the time the Forest Service adopted the Ottawa's current management plan, in 2006, "[m]any hemlock stands [had been] replaced by aspen[,]" and the forest's balance of hemlock and aspen trees had flipped. *Id.* at 3-44, 3-49. Other species that had previously thrived in the region, like white pine and white cedar, had also lost significant ground on the Ottawa.

36. According to the Forest Service's own numbers, the Ottawa's unnatural shortage of hemlock, pine, cedar, and other long-lived conifers has not eased in recent years. In areas of the forest that are supposed to sustain "moderate to high amounts of long-lived conifer cover types[,]" for instance, hemlock and pine numbers have remained below historic levels and the Forest Service's own goals. Ottawa National Forest, Forest Plan (2006) ("Ottawa Forest Plan"), at 3-21 (describing Management Area 4.1a lands); Revised EA at 9 (noting that only 28 percent of 4.1a lands currently sustain long-lived confers, below the desired range of 30 to 60 percent).

37. A primary driver of this problem, the agency has admitted, is the region's excessive population of white-tailed deer. In the words of the Forest

Service, "[d]eer are causing problems with tree regeneration … on the Ottawa[,]" and the "species that seem to be particularly susceptible to … browse pressure include northern white cedar, eastern hemlock, … [and] white pine[.]" Ottawa Plan FEIS at 3-99, 3-163. For both hemlock and cedar, the problem appears to be dire, as "there is a concern for [the] long-term viability of … [the species] on the Ottawa, mainly due to the lack of successful regeneration in many areas." *Id.* at 3-101; *see also, e.g.*, *id.* at 3-50 (noting that "[s]uccessful regeneration of hemlock is uncertain [on the Ottawa], largely because of severe browsing from high white-tailed deer populations").

38. Rather than remedying the Ottawa's regeneration problem, the Silver Branch project promises to exacerbate it. If the agency's sprawling, 177,772-acre plan is allowed to move forward, nearly 80,000 acres of Michigan's Upper Peninsula will be subject to intensive logging—and this logging will have the foreseeable effect of causing the region's overgrown deer population to grow even larger. As the Forest Service explained in its biological assessment on the project:

> Deer rel[y] heavily on mast-producing trees and/or seedlings and saplings for food throughout the fall and winter months. Following a timber harvest, more space and light is available for seedling and saplings to grow, which produces more food for deer. … Therefore, timber harvesting will result in a flush of new woody and herbaceous vegetation and increase the carrying capacity of … [deer] for several years[.] … In most locations, positive … [deer] responses should begin within 1-3 growing seasons after harvests and persist for at least 10-20 years.

Ottawa National Forest, Biological Assessment for the Silver Branch Vegetation Management Project (Nov. 13, 2025) ("Silver Branch BA"), at 15. The Silver Branch

project, in other words, would support further growth of the region's overgrown deer herds at the expense of the Ottawa's struggling hemlock, cedar, and pine populations.

39. The negative implications of the Silver Branch project are not limited to deer browsing and regeneration, as the authorized logging would also affect some of the forest's most wild and treasured areas. Under the Forest Service's plan, extensive clearcuts would be allowed on lands that border the protected Sturgeon River Gorge Wilderness Area and the nearby North Country National Scenic Trail, a unit of the National Park System:




Revised EA at 6.

40. All told, the environmental consequences of the Silver Branch project promise to be significant:

41. More than 25,000 acres of public land would be subject to clearcuts, removing "all or most" of their maturing trees and the essential habitat they provide. Revised EA at 19.

42. An additional 55,000 acres of the Ottawa would be subject to selection harvests, thinning, or other forms of logging, resulting in a further loss of trees and the habitat they provide. These areas would also be prevented from "transitioning to other forest types" through "natural succession[,]" further slowing the Ottawa's recovery from a century of excessive cuts. Revised EA at 11, 19–20.

43. The Northern long-eared bat—an endangered species—would "likely" suffer harm "due to the net loss of potential roost trees[,]" while endangered wolves and other wildlife species could be displaced by "noise and human presence" for up to ten years and threatened with a "short-term risk for direct mortality especially during periods when rearing young[.]" Revised EA at 46, 56.

44. The construction of new logging roads would "permanently" scar thirteen miles of forest, and the expansion of two gravel pits would "permanently" destroy fourteen acres more. Revised EA at 57.

45. The project's "logging processes would increase the [amount of] fuel … on the forest floor[,]" creating an "unnatural load of hazardous fuels" that could "cause increased wildfire intensity and an increased rate of fire spread." Ottawa

National Forest, Silver Branch Vegetation Management Project: Environmental Assessment and Finding of No Significant Impact (Dec. 2025) ("Original EA"), at 58.

46. And finally, the "degree of soil impact from project activities" could prove dramatic, as "repeated entries" by mechanized equipment "without sufficient recovery intervals could push soil impacts beyond tolerable bounds" and cause "long-term impacts" on the Ottawa's soils. Revised EA at 54, 57.

47. Despite the admitted and foreseeable potential for significant impacts, the Forest Service refused to evaluate the Silver Branch project—along with a reasonable range of more protective alternatives—in a thorough environmental impact statement. This was particularly striking given that the agency had previously determined that much smaller proposals could not move forward on the Ottawa without the benefit of such a review. Before approving the Plantation Lakes Project, for instance—which spanned an area of "approximately 17,700 acres"—the Forest Service "prepare[d] an … EIS … to disclose the effects of timber harvest[;] site preparation for natural and artificial regeneration[;] planting[;] road management … [;] trail construction[;] maintenance of permanent openings for wildlife habitat[;] and classification of old growth[.]" U.S. Forest Service, Notice of Intent to Prepare an Environmental Impact Statement: Ottawa National Forest's Plantation Lakes Project, 65 Fed. Reg. 34,139, 34,139–40 (May 26, 2000). And before approving the Baltimore Vegetative Management Project—which spanned 3,360 acres—the Forest Service "prepare[d] an … EIS … to disclose the effects of … [t]imber harvest; site preparation for natural and artificial regeneration; tree

planting; … classification of old growth; … expansion of an existing gravel pit; and … road construction[.]" U.S. Forest Service, Notice of Intent to Prepare an Environmental Impact Statement: Ottawa National Forest's Baltimore Vegetative Management Project, 67 Fed. Reg. 45,076, 45,076–77 (July 8, 2002).

48. Rather than evaluating the Silver Branch project in an environmental impact statement, the Forest Service elected to declare its impacts insignificant in a conclusory environmental assessment, or "EA." And rather than giving members of the public a meaningful opportunity to review its analysis and identify critical shortcomings, the Forest Service imposed arbitrary limits on the comment process.

49. On December 18, 2025—at the start of the winter holiday season—the agency released its environmental assessment and announced a thirty-day period for public comment. The following day, in an email to the relevant Ottawa officials, an attorney for the plaintiff organizations noted that the assessment "repeatedly reference[d] (and explicitly incorporate[d]) a number of documents in the 'Silver Branch VMP Project File[,]'" none of which had been made available to the public. The Forest Service did not reply until January 5, 2026—more than two weeks later. And rather than sharing its entire "Project File," the agency stated that "[a]ny documents that are referenced in the EA" would only be made "available by request." On January 6, the organizations' attorney responded with a list of sixteen documents that were essential to understanding the Forest Service's analysis—documents the agency slowly released in a series of installments on January 7, January 8, January 9, and January 13.

50. As a result of the Forest Service's refusal to release its full "Project File," members of the public—including the plaintiff organizations—did not have a chance to review all of the materials on which the agency's environmental analysis is allegedly based before the end of the comment period. Indeed, the plaintiff organizations did not even have access to all of the specific documents they had requested until just over a week remained in the comment period. This delay also prevented them from engaging with experts and other consultants to evaluate the assumptions, analysis, and conclusions set forth in the Forest Service's materials.

51. Despite the inadequacy of the Forest Service's comment period, the plaintiff organizations submitted a detailed comment letter on January 22, 2026. In it, they identified numerous ways in which the agency had acted unreasonably and unlawfully in preparing its environmental analysis and finding of no significant impact. First, the Forest Service arbitrarily discounted the extraordinary scale of the project and the ecological significance of logging tens of thousands of acres of naturally maturing forest. Second, it arbitrarily ignored the significant gaps in the laws, best management practices, and design criteria that the assessment repeatedly cited as a basis for the agency's finding of no significant impact. Third, it failed to provide a reasoned analysis of the project's potential environmental significance. Fourth, it neglected to meaningfully address a long list of issues that were central to the project's effects—among them, climate change, wildfire, and the impacts of deer browsing on tree regeneration. Fifth, it refused to consider even a single alternative that would have protected some of the Ottawa's most sensitive

and cherished lands from logging. And finally, it defied the requirements of both the National Forest Management Act and the Ottawa's own management plan in proposing extensive logging within areas that are unsuitable for timber harvest or already struggling with regeneration.

52. The Forest Service had an opportunity to correct these deficiencies before issuing its draft decision notice in April of this year. It failed to do so. And when the plaintiff organizations renewed their concerns in a lengthy set of formal objections on June 1, 2026—and thereby exhausted all available administrative remedies—the agency arbitrarily dismissed them again.

53. The Forest Service's July 17, 2026, environmental assessment, finding of no significant impact, and decision to approve the Silver Branch project defied the fundamental requirements of the National Environmental Policy Act, the National Forest Management Act, and the Ottawa's own management plan. They should be vacated by this Court.

## FIRST CAUSE OF ACTION
## NEPA—Arbitrary and Unlawful Failure to Consider Alternatives

54. The preceding paragraphs are incorporated here by reference.

55. The Forest Service's failure to consider a reasonable range of alternatives to the Silver Branch project in its environmental analysis was arbitrary and unlawful under the National Environmental Policy Act.

56. In order to fulfill NEPA's requirements, again, an agency's environmental review must evaluate a "reasonable range of alternatives … that are technically and economically feasible, and meet the purpose and need of the

proposal[.]" 42 U.S.C. § 4332(2)(C)(iii). This obligation applies with particular force when a proposal "involves unresolved conflicts concerning alternative uses of available resources[.]" *Id.* § 4332(H).

57. The Forest Service defied this requirement by disregarding both a significant conflict regarding the use of some of the Ottawa's lands and a reasonable alternative that would have resolved the issue. During scoping, the Environmental Law and Policy Center notified the agency that the Silver Branch project would "overlap[] with about 2,000 acres" a broad coalition of businesses and groups—Keep the U.P. Wild—had proposed as an "addition to the [Ottawa's] Sturgeon River Gorge Wilderness [Area]." ELPC, Scoping Comments on the Silver Branch Vegetation Management Project (July 18, 2025) ("Scoping Comments"), at 1. As ELPC's comments explained, "[s]upport for the Sturgeon River Gorge Wilderness Area Addition is growing and comes from environmental, business, outdoor-recreation, hunting, fishing, student, political, veterans, outdoor-advocacy, and faith groups, including more than 70 Upper Peninsula-based organizations and businesses." *Id.* at 3. And this support is not surprising, given the proposed addition's "value to local wildlife and its suitability for remote recreation, such as hiking and hunting," which "allow[] visitors to immerse themselves in nature's remoteness and solitude." *Id.*

58. In an effort to protect the lands at issue, ELPC asked the Forest Service to evaluate the option of excluding them from the Silver Branch project's logging authorizations "in order to preserve the opportunity for future Wilderness

designation of the area by Congress." Scoping Comments at 1. While the plaintiff organizations reiterated this request in their later comments and objections, the Forest Service refused to assess the possibility, choosing instead to dedicate its entire assessment to a single action alternative: a 177,772-acre project that would allow clearcuts up to the very edge of the Ottawa's existing wilderness area.



59. As a result of its binary, 177,772-acres-or-nothing approach, the Forest Service's assessment arbitrarily obscured the availability of better tailored alternatives that would have protected some of the Ottawa's most treasured resources while also advancing the agency's stated purpose and need. This was arbitrary and unlawful.

60. In attempting to defend the limitations of its analysis, the Forest Service has argued that the extraordinary scale of the Silver Branch project's clearcuts is required to meet the agency's targets for aspen and birch, given that "[a]spen and birch stands would naturally transition to other forest communities, especially northern hardwood types, without treatment." Revised EA at 20. The agency's own numbers, however, demonstrate otherwise. According to the Forest Service's environmental assessment, the Ottawa's "vegetative composition" is largely within the ranges established under the forest's current management plan. *Id.* at 8–9 (Table 1). And in Management Area 4.1a—which encompasses more than 46,000 acres of the project area—aspen and birch numbers are well above desired levels, undermining any assertion that clearcuts are needed there to meet the agency's goals. *Id.* All told, the Forest Service acted arbitrarily in concluding that more than 25,000 acres of the Ottawa have to be clearcut—and nearly 55,000 acres more have to be subjected to other forms of logging—in order to address "the resource gaps, or the differences identified, between the existing conditions on the landscape and the range of desired conditions" on the forest. *Id.* at 4.

61. Because the Forest Service's refusal to consider a reasonable range of alternative actions was arbitrary and unlawful, the agency's environmental assessment, finding of no significant impact, and decision should be vacated by this Court. 5 U.S.C. § 706(2); 42 U.S.C. §§ 4332(2)(C)(iii), 4332(H).

**SECOND CAUSE OF ACTION**
**NEPA—Arbitrary Finding of No Significant Impact**

62. The preceding paragraphs are incorporated here by reference.

63. As previously explained, NEPA prohibits federal agencies from authorizing any "major Federal action[] significantly affecting the quality of the human environment" without first preparing and considering a "detailed statement" regarding the foreseeable impacts of the action and reasonable alternatives. 42 U.S.C. § 4332(2)(C). Rather than preparing such an analysis, the Forest Service elected to declare that the Silver Branch project won't have any significant effects at all. The agency's environmental assessment and finding of no significant impact were arbitrary in numerous respects.

64. First, the Forest Service arbitrarily failed to consider whether the impacts of the Silver Branch project could prove environmentally significant when combined with the extensive logging that has already been undertaken or authorized in the region. This failure was particularly pronounced in the agency's arbitrary analysis of the project's potential impacts on endangered gray wolves—an analysis that relied on the species' asserted ability to move out of the project area without considering the activities wolves might encounter on adjacent lands.

65. Second, in authorizing clearcuts beside the Sturgeon River Gorge Wilderness Area and the North Country Trail, the Forest Service arbitrarily ignored the unique characteristics of those lands, which are exceptionally wild and cherished by the Ottawa's visitors.

66. Third, while conceding that the Silver Branch project's "long[,]" thirty-year "timeframe introduces challenges tied to changing weather patterns" due to climate change—"including more frequent intense rain events and shorter winter operating seasons"—the Forest Service's assessment arbitrarily failed to address the resulting uncertainty regarding the project's environmental effects. Revised EA at 54.

67. And finally, although the Forest Service defied the National Forest Management Act and the Ottawa's own forest plan in choosing to authorize actions that will further expand the region's overgrown deer population, the agency failed to thoroughly consider the potential effects of such an increase.

68. In addition to disregarding a number of relevant factors, the Forest Service's finding of no significant impact rested on an arbitrary effort to discount the potential significance of the effects that were actually acknowledged in the environmental assessment.

69. First, the assessment placed heavy reliance on the asserted protections of various "design criteria" and "Best Management Practices"—declaring, for instance, that "[t]he degree of soil impact from project activities would depend heavily on the consistent application of the included project design criteria and Best

Management Practices[,]" as "repeated entries without sufficient recovery intervals could push soil impacts beyond tolerable bounds[,]" and that "[p]ermanent losses from new roads, gravel pit expansion, and trail construction … highlight[ed] the need for strict adherence to safeguards and careful oversight to sustain long-term soil productivity and ecosystem resilience." Revised EA at 54, 58. The Forest Service's own record, however, indicates that the project's design criteria and BMPs are unlikely to be consistently applied. According to one of the agency's own expert reports, the Ottawa's "BMP monitoring" has "identified numerous cases in which design criteria were not fully implemented, and therefore, the project … [would] have [a] risk of adverse impacts." Ryan J. Beatty and Blaze Budd, Silver Branch VMP: Aquatics Effects Analysis (Oct. 31, 2025), at 60. "Mistakes and errors during application of design criteria have [also] occurred," the report admits, creating further "potential for effects … beyond those anticipated with application of design criteria." *Id.* at 44. The agency's failure to evaluate these foreseeable effects in its environmental assessment was arbitrary.

70. Second, the assessment also declared that "[c]onsistency with relevant laws, regulations, policies, and Ottawa Forest Plan direction" would somehow "ensure[] that the [project] does not exceed thresholds for significance." Revised EA at 35. The document arbitrarily failed to support this conclusion with any meaningful explanation or analysis, however—leaving decisionmakers and the public to wonder what specific laws, impacts, and "thresholds for significance" the agency had in mind.

71. Finally, in attempting to minimize the elevated fire risk that could foreseeably result from the Silver Branch project, the Forest Service arbitrarily ignored a number of key studies regarding the connection between logging and wildfire—studies the plaintiff organizations referenced in their comments and objections.

72. Because the Forest Service's environmental assessment, finding of no significant impact, and final decision were arbitrary, they should be vacated by this Court. 5 U.S.C. § 706(2).

**THIRD CAUSE OF ACTION**
**NFMA—Arbitrary Authorization of Logging on Unsuitable Lands**

73. The preceding paragraphs are incorporated here by reference.

74. In addition to violating NEPA, the Forest Service's authorization of commercial logging on more than 11,000 acres of unsuitable land arbitrarily defied the requirements of the National Forest Management Act and the Ottawa's own forest plan.

75. With its 2006 management plan, the Forest Service determined that less than half of the Ottawa's lands—488,000 acres—are "capable of producing commercial volumes of timber on a sustained basis" and thus "suitable for timber production." Ottawa National Forest, Record of Decision: Final Environmental Impact Statement to Accompany the Land and Resource Management Plan (Mar. 2006), at 8. The rest of the forest was accordingly designated as not suited for timber production. As the Service explained at the time, these not-suited determinations were based on a variety of considerations, including the absence of

forested lands or "industrially" used tree species; the need to protect wilderness areas; the inability to undertake commercial harvests on particular lands without causing "irreversible resource damage to soils, productivity, or watershed conditions"; the importance of protecting old growth; and other "Forest Plan objectives[.]" Ottawa Plan FEIS at A-14–A-15, A-19.

76. The Ottawa's identification of "suitable" and "not suitable" lands had legal consequences. Under NFMA, decisions about "the use and occupancy" of a national forest must be "consistent with" the forest's management plan—including any determinations the plan has made about where commercial logging may (and may not) be allowed. 16 U.S.C. § 1604(i).

77. Despite the restrictions on logging areas deemed "not suited for timber production," the Silver Branch project would allow just that—at a large scale. Based on an analysis of Forest Service data, it appears the project would authorize logging on more than 11,000 acres of unsuitable lands.

78. In attempting to defend the Silver Branch project's unsuitable-land logging, the Forest Service has declared that the Ottawa's "not suitable" designations "just restrict[] the idea that timber is the sole purpose for the activity"—and that "[t]here are many times where habitat improvement activities result in the removal of trees, such as aspen for ruffed grouse and white tail deer, snowshoe hare, black bear, American woodcock, and golden wing warbler to name a few." Ottawa National Forest, Silver Branch Vegetation Management Project: Response to Comments on Environmental Assessment (Apr. 2026), at 47.

Conspicuously, however, the Forest Service made no effort to demonstrate that the unsuitable acres at issue are actually in need of "habitat improvement activities[,]" that the logging at issue would be limited to so narrow a purpose, or that the logging would result in the desired improvements.

79. The agency's authorization of logging in unsuitable areas was arbitrary and unlawful. At the very least, the Ottawa's prohibition on unsuitable-land logging requires a reasoned demonstration that any commercially desirable trees, like aspen, are being targeted for allowable purposes when logging will take place in an unsuitable area. Ottawa Plan FEIS at 3-44 (noting that aspen is a "timber product that is in high demand"). As the Forest Service has made no attempt at providing such a demonstration, its assessment and decision should be vacated by this Court. 5 U.S.C. § 706(2).

**FOURTH CAUSE OF ACTION**
**NFMA—Arbitrary Authorization of Extensive Clearcuts**

80. The preceding paragraphs are incorporated here by reference.

81. In authorizing extensive clearcuts that will cause the region's overgrown deer population to grow even larger, leading to further regeneration failures for hemlock and other tree species, the Forest Service arbitrarily defied the requirements of both the National Forest Management Act and the Ottawa's own forest plan.

82. With the enactment of NFMA in 1976, Congress sought to address the growing controversy regarding the Forest Service's excessive reliance on clearcuts. Under the statute, again, clearcutting can "only" be "used … on National Forest

System lands" when, among other things, it is "determined to be the optimum method … to meet the objectives and requirements of the relevant land management plan"; when "the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area"; and when "such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource." 16 U.S.C. § 1604(g)(3)(F); *see also id.* § 1604(i) (requiring Forest Service actions to be "consistent with" forest-plan provisions).

83. The Forest Service's review and authorization of the Silver Branch project defied these statutory limits. Rather than ensuring that the project's extensive clearcuts would be "consistent with … the regeneration" of the Ottawa's trees, for example, the agency acknowledged that the logging would lead to the further growth of the region's white-tailed deer population—a population that is already threatening the "long-term viability" of hemlock and other species through "severe browsing" and "the lack of successful regeneration" it has caused. 16 U.S.C. § 1604(g)(3)(F)(v); Ottawa Plan FEIS at 3-50, 3-99, 3-101, 3-163. This was arbitrary and unlawful.

84. While the Forest Service was also required to determine whether Silver Branch's clearcuts would be the "optimum method … to meet the objectives and requirements" of the Ottawa's management plan—and to ensure that they would ultimately be "consistent with" the plan's provisions—it failed to do so. 16

U.S.C. §§ 1604(g)(3)(F)(i), 1604(i). Indeed, the agency's own analysis pointed to the opposite conclusion. As previously noted, more than 46,000 acres of the Silver Branch project fall within Management Area 4.1a, which is supposed to "[e]mphasize[] middle- to late-successional coniferous community types" and "[m]aintain[] moderate to high amounts of long-lived conifer cover types[.]" Ottawa Forest Plan at 3-21. According to the Forest Service's numbers, however, the Ottawa's 4.1a lands are currently short on conifers—and overloaded with aspen. While only 5 to 15 percent of the area is supposed to support stands of aspen and birch, the count currently stands at 26 percent. Revised EA at 9. And while hemlock, pine, and other long-lived conifers are supposed to cover 30 to 60 percent of the area, they are currently limited to 28 percent. *Id.* Given these numbers, the Forest Service's decision to authorize extensive clearcuts within Management Area 4.1a defied the requirements of the Ottawa's own management plan by seeking to benefit an aspen population that is already exceeding the agency's targets at the expense of confers that are falling short of the agency's goals.

85. Because the Forest Service's assessment and decision were arbitrary and unlawful under the National Forest Management Act and the Ottawa's forest plan, they should be vacated by this Court. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1. Declare that the Forest Service's environmental assessment, finding of no significant impact, and final decision regarding the Silver Branch Vegetation

Management Project were arbitrary and unlawful under the National Environmental Policy Act, the National Forest Management Act, and the Ottawa National Forest's management plan;

2. Vacate the Forest Service's environmental assessment, finding of no significant impact, and final decision authorizing the Silver Branch project;

3. Grant plaintiffs injunctive relief prohibiting the Forest Service from implementing the Silver Branch project;

4. Award plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

5. Grant plaintiffs such further relief as the Court deems just and proper.

Respectfully submitted this 17th day of November, 2026.

s/ Sean Helle
Sean Helle, Senior Attorney
Callie Sharp, Senior Associate Attorney
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, Illinois 60601
shelle@elpc.org
csharp@elpc.org
(312) 673-6500

*Counsel for UPEC, ELPC, and NRDC*

Garett Rose, Senior Attorney
Todd Gleason, Senior Litigating Counsel
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
grose@nrdc.org
tgleason@nrdc.org
(202) 717-8355

*Counsel for NRDC*